UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONTONNIA MAURICE TURNER,

    Plaintiff,

v.

    Case No. 1:23-cv-625

    Hon. Hala Y. Jarbou

ST. JOSEPH PUBLIC SCHOOLS,

    Defendant.
_____/

## OPINION

Plaintiff Contonnia Maurice Turner filed this lawsuit claiming Defendant St. Joseph Public Schools ("SJPS") engaged in race-based discriminatory conduct, violating Title VII of the Civil Rights Act and the Elliott-Larsen Civil Rights Act ("ELCRA"). (Compl., ECF No. 1.) Turner claims SJPS failed to promote him, paid him less, retaliated against him, and created a hostile work environment due to his race. Before the Court is SJPS's motion for summary judgment. (ECF No. 29.) For the reasons discussed herein, the Court will grant the motion.

### I. BACKGROUND

Turner has worked various maintenance jobs throughout his career. (Turner Dep. 10, 13-15, 22, 34-35, ECF No 29-1.) He was certified in heating and air conditioning maintenance and received an associate's degree in industrial maintenance. (*Id.* at 22, 36.) He spent years working with apartment complexes and universities but wanted more stable and consistent employment. (*Id.* at 13-15, 24-25.) After interviewing for several maintenance jobs, he eventually ended up at SJPS. (*Id.* at 29, 34-35.)

Turner first began working for SJPS when Mike King—SJPS's maintenance supervisor—hired him as a contractor through Enviro-Clean, a third-party custodial company, in 2019. (*Id.* at 34-35, 44.) His responsibilities included cutting grass, fixing leaky pipes, custodial work, and general repairs. (*Id.* at 41.) If a project involved technical skills or required a certification, SJPS would enlist additional contractors or specialists to assist. (*Id.* at 41-42; King Dep. 51-52, ECF No. 29-1.)

Turner worked alongside two union maintenance workers employed directly through the school. (King Dep. 13-14.) The Enviro-Clean position handled the custodial duties. (*Id.* at 14.) The school-based maintenance workers took on more technical responsibilities. (Turner Dep. 41-42; King Dep. 51-52.) Each maintenance worker (the two school-based positions and the Enviro-Clean contractor) had a distinct position in the maintenance department. (Dongvillo Dep. 75, ECF No. 29-1.) There was a light-duty maintenance worker (employed as an Enviro-Clean contractor), a groundskeeper position, and a head/general maintenance worker. (*Id.*; Job Postings, ECF No. 29-1, PageID.244-251.) The positions had different pay scales given their respective responsibilities. (Dongvillo Dep. 75.)

Turner felt initial strain in his relationships with the other maintenance workers because they feared he would replace them. (Turner Dep. 75.) Their relationships improved with time. (*Id.*) In a tragic couple of weeks for SJPS, both of the school-based maintenance workers passed away. (Watts Dep. 19, ECF No. 33-1.) Turner then asked to take on one of the school-based positions now that there were multiple openings. (Turner Dep. 45.) King declined this request. (*Id.*) King was not confident in Turner's ability to handle the technical skills of the school-based positions. (King Dep. 51-52.) King hired Bill Roll and Shaun Watts to fill the school-based positions. (Turner Dep. 50, 56.) Although King did not hire Turner for the previously vacant,

higher-pay-scale positions, King eventually hired him as a school-based employee to fill the same light-maintenance role he performed as a contractor. (*Id.* at 59-62.) His base salary decreased by $0.50 per hour, but he received enhanced benefits through SJPS. (*Id.*)

Turner admits he let his jealousy interfere with his relationships with Roll and Watts. (*Id.* at 76-77.) Turner thought he should have been hired for the initially vacant school-based positions instead of Roll and Watts. (*Id.*) He resented getting paid less than Roll and Watts. (*Id.* at 58-60.) Unlike Roll and Watts, Turner's contract included language that made custodial work his responsibility; he thought that was unfair. (*Id.* at 65, 81-82.) Turner also felt left out to dry when he was given tasks—like moving chairs and working on mulch—that, in his opinion, should have been assigned to multiple people. (*Id.* at 80, 127.)

Conflict arose. One day, when the maintenance staff was tasked with preparing the grounds for a football game, Roll came in late. (*Id.* at 91.) Before Roll arrived, Turner and Watts began dividing up responsibilities. (*Id.*) When Roll arrived, Turner directed Roll to take on a number of tasks in the stadium area. (*Id.* at 92.) According to Turner, King and Roll took issue with Turner's attempts to direct other workers' assignments and act as a supervisor. (*Id.* at 92-94.) Turner also suggests that, as the maintenance supervisor, King was frustrated by a perception that Turner was circumventing his authority. (*Id.* at 97-99.) In another confrontation, which took place after Roll was promoted to a supervisory position, Turner claims that Roll was unnecessarily upset after Turner did not show up to an assignment. (*Id.* at 204-05.) Turner raised his voice when King brought up this incident, a reaction Turner attributes to his continued frustration with King hiring Roll and Watts first. (*Id.* at 205-07.) Turner later apologized. (*Id.*) Although Turner had tense moments with his colleagues, there were also moments of cooperation and comradery. In one

3

instance, King wanted to take the maintenance department out for a round of golf and teambuilding, although the outing was canceled when Turner declined the invitation. (*Id.* at 122.)

Turner resigned from SJPS after sustaining an injury to his back when trying to lift a heavy object during a work assignment. (*Id.* at 135-36.) Turner claims this task was one of many projects assigned to him that required more than one person to complete; however, he did not ask for assistance when King assigned such tasks. (*Id.* at 127-30.)

Although Turner says he cannot pinpoint specific examples of race-motivated mistreatment or a racist atmosphere, he believes SJPS generally mistreated him due to his race. (*Id.* at 85, 124-26.) He raised his concerns about pay discrepancy and his custodial tasks in his initial meeting with human resources ("HR"), but did not provide any further complaints, choosing to "[k]eep[] [his] mouth quiet and just do[] [his] job." (*Id.* at 142, 161.)

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).

Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

4

## III. ANALYSIS

Turner claims SJPS violated Title VII of the Civil Rights Act and the ELCRA. He alleges that SJPS retaliated against him (Counts I and II); engaged in race-based discrimination by failing to promote him and paying him less (Counts III and IV); and fostered a hostile workplace environment (Counts V and VI).

### A. Federal Claims Under Title VII of the Civil Rights Act

#### 1. Retaliation (Count I)

Claims of race-based retaliation under Title VII follow the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Moore v. Coca-Cola Bottling Co.*, 113 F.4th 608, 627 (6th Cir. 2024). First, the plaintiff must establish a prima facie case by demonstrating that: (1) they engaged in activity protected by Title VII; (2) their exercise of such protected activity was known by the defendant; (3) with knowledge of the protected activity, the defendant took an adverse action towards the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Id.* If the plaintiff can establish a prima facie case, "the burden shifts to the defendant to show that they had a nondiscriminatory reason for their actions." *Id.* If the defendant's "articulated reasons are legitimate, the burden again shifts" back to the plaintiff "to produce sufficient evidence to permit a reasonable factfinder to conclude that" the defendant's reason was pretextual. *Id.*

Turner fails to establish a prima facie case. Turner's alleged protected activity was reporting harassment to HR.[1] (Compl. 4.) According to Turner, the harassment was SJPS hiring

---

[1] Turner's complaint alleges that his protected activity is "more fully laid out in the statement of facts, including, but not limited to when Plaintiff protested and reported harassment to human resources." (Compl. 4.) While filing an EEOC complaint would constitute protected activity, Turner did not submit the complaint until after he resigned; SJPS took no adverse actions after—or in response to—his complaint. (*Id.* at 3.) The statement of facts does not include any other actions that can be construed as protected activity for his retaliation claim.

5

Roll and Watts first, paying Roll and Watts a higher wage, including custodial work in his contract, and his confrontation with Roll after Turner directed him to perform certain tasks to prepare the stadium for a gameday. (Turner Dep. 140-42, 152-53.) He reported his concerns with SJPS hiring Roll and Watts first, paying him less, and assigning him undesirable duties in his contract to HR. (*Id.*) This alleged mistreatment cannot constitute retaliation because they occurred before he reported them as issues. For causation, his report to HR must have caused these issues, but, as Turner explains, it was these issues that caused him to report concerns to HR. (*Id.*) Turner does not establish the requisite causal connection.

Further, Turner did not report his confrontation with Roll as harassment. Turner admits he "said very little to human resources," and limited the report to his frustrations with the hiring process, his wages, and his responsibilities. (*Id.* at 141-44.) Instead, Turner decided "[k]eeping [his] mouth quiet and just doing [his] job" was the best path forward. (*Id.* at 161.) In regards to Roll's alleged harassment, Turner did not engage in any protected activity for which SJPS could have retaliated. Thus, Turner fails to establish his prima facie case for retaliation under Title VII.

### 2. Discrimination (Count III)

Because Turner does not allege direct evidence of racial discrimination (*id.* at 85, 124-26), the Court must use the previously discussed burden-shifting approach from *McDonnell Douglas*. *Moore*, 113 F.4th at 622. Turner alleges racial discrimination on two separate grounds: failure to hire and pay disparity.[2]

---

[2] The complaint alleges discrimination based on "offensive communication and/or conduct." (Compl. 6.) Turner clarified that this offensive communication and/or conduct referred to SJPS hiring Roll and Watts for the school-based vacancies and paying him less for his work. (Turner Dep. 146-47, 154.)

**(a) Failure to Hire**

Turner claims that SJPS did not hire him for the initial school-based maintenance positions due to race. He must first establish a prima facie case for discriminatory failure to hire by showing that: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment decision; and (4) he was treated differently than a similarly situated non-protected person. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023). For failure to hire cases, the plaintiff's burden of establishing a prima facie case is not onerous. *Id.* It is undisputed that, as an African American man, Turner is a member of a protected class. He also suffered an adverse employment decision when SJPS did not hire him for the vacant school-based maintenance positions. *See, e.g.*, *Harris v. City of Akron*, 836 F. App'x 415, 419 (6th Cir. 2020). Whether Turner was qualified for the job, and whether he was treated differently than similarly situated persons, require closer attention.

In the context of a discrimination claim under Title VII, to determine whether a candidate or an employee was qualified for a position, the Court must focus on a plaintiff's objective qualifications. *Hammond v. Sysco Corp.*, No. 23-5385, 2023 WL 8847365, at *5 (6th Cir. Dec. 21, 2023) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc)). The Court considers "education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler*, 317 F.3d at 576.

Looking at the facts in the light most favorable to Turner, he had the educational background (including relevant certifications), experience, and general skills to meet the minimum qualifications for the maintenance jobs. He had a relevant associate's degree and decades of general maintenance experience; while SJPS had to call in specialists or contractors to assist Turner with certain tasks, the previous school-based employees needed similar assistance. (Turner Dep. 41-42.) Importantly, at this stage, Turner need not establish that he was more qualified than

7

Roll and Watts, only that he met the minimum qualification standards expected of the job. *Wexler*, 317 F.3d at 576. He has met this burden.

To establish whether SJPS treated Turner different than similarly situated persons who were not part of his protected class, the Court must find comparable applicants. *See Lynch v. ITT Educ. Servs., Inc.*, 571 F. App'x 440, 444 (6th Cir. 2014). A similarly situated individual need not be an exact comparison. *Id.* The Court must determine what factors are relevant, looking at experience, qualifications, and other, similar indicators. *Id.*; *see also Campbell v. Hamilton Cnty.*, 23 F. App'x 318, 325 (6th Cir. 2001).

Given the nature of a discriminatory failure to hire claim, the Court will evaluate Turner compared to Roll and Watts as applicants. Even though Roll and Watts had specialization in groundskeeping and mechanics respectively, the applicants all had significant experience in maintenance. (Watts Dep. 18-23.) Each applicant met the minimum qualifications, looking at objective characteristics. Both parties accept that Roll and Watts are white men not in a protected class; they are similarly situated persons who were treated differently—they were hired for the positions that Turner sought. Turner has met the non-onerous burden of establishing a prima facie case.

Because Turner established a prima facie case, the burden shifts to SJPS to "produc[e] evidence that [Turner] was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *See Levine*, 64 F.4th at 797 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). SJPS must "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Id.* (quoting *Burdine*, 450 U.S. at 254-55)). Depositions can establish the legitimate, nondiscriminatory reason. *See id.*

King (who was responsible for hiring his maintenance team at SJPS) claims he did not hire Turner for the higher-level school-based positions due to Turner's deficiencies in maintenance tasks. (King Dep. 51-53.) He referenced Turner's issues installing lighting, accidentally damaging the school's water fountains, and other technical tasks. (*Id.*) Instead, King hired him for custodial and basic maintenance work, a continuation of his contractor responsibilities. (*Id.*) King determined Roll and Watts were better suited for the more technical school-based positions. Lacking requisite skills constitutes a legitimate, nondiscriminatory reason to reject an applicant. *See Levine*, 64 F.4th at 798. The burden shifts back to Turner to show this reason was pretextual.

Turner cannot show King's hiring decision was pretextual. A plaintiff can "demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* "When qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation for its hiring decision." *Id.* (quoting *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006)). The Court looks at whether the plaintiff can establish that they were "*significantly* better qualified for the job." *Id.* (emphasis added) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)). In theory, because an employer does not usually select a less-qualified candidate, if the plaintiff is significantly more qualified, racial discrimination may be inferred. *Id.* at 799 (quoting *White*, 533 F.3d at 393). "A laxer standard would move this court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." *Bender*, 455 F.3d at 627 (internal citation omitted).

To establish a candidate as significantly more qualified, the Court typically looks to experience, awards, reviews, and other factors that would allow an employer to determine a candidate is significantly more qualified for a job. *See, e.g.*, *Levine*, 64 F.4th at 799; *Bender*, 455 F.3d at 628. Turner does not establish that he is significantly more qualified. He claims his experience as an SJPS contractor and his certifications make him a significantly more qualified candidate, leaving race-based discrimination as the only logical reason SJPS did not hire him. While he had experience at SJPS, as King pointed out, this experience led his supervisors to determine he could not handle the additional and elevated responsibilities required for the vacant positions. (King Dep. 51-53.) The school had to bring in contractors and specialists for technical work, and although Turner claims to have certifications in HVAC maintenance, SJPS still had to bring in contractors for projects that required certifications. (Turner Dep. 36, 41-42.) King either did not know about Turner's certifications, or he did not trust Turner's technical skills. Either way, Turner is unable to establish that he was significantly more qualified than Roll and Watts. King had more faith that Roll and Watts were prepared to take on the more technical positions. (King Dep. 51-53.) Turner's failure to hire claim will be dismissed.

### (b) Pay Disparity

Turner claims SJPS paid him less due to his race. The Court follows a similar burden shifting analysis as for Turner's other claims. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021). Here, to establish a prima facie case for wage discrimination, Turner "must show [he was] paid lower wages than employees outside the protected class for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed

under similar working conditions." *Woods v. FacilitySource, LLC*, 640 F. App'x 478, 483 (2016) (internal citation and quotation omitted).[3]

Turner's salary slightly decreased as he shifted to a school-based position, offsetting the enhanced benefits. (Turner Dep. 59-62; King Dep. 18-19.) Because Roll and Watts also received these benefits, Turner was compensated less than his white counterparts, who were similarly situated employees. The employees need not perform the exact same tasks for the Court to consider them similarly situated. *See Briggs*, 11 F.4th at 508. Although Turner would handle the custodial duties while Roll and Watts primarily handled more maintenance-specific and groundskeeping assignments, in totality, they would often share responsibilities and complete similar tasks. (Turner Dep. 54-56.) And they all reported to King. (King Dep. 6-7, 15-16.) Turner has established a prima facie case for wage discrimination.

The burden then shifts to SJPS to show that the difference in compensation was for a legitimate, nondiscriminatory reason. *Briggs*, 11 F.4th at 508. SJPS must only "articulat[e] a legitimate business explanation for the disparity, supported by some evidence." *Id.* at 513. It has. When employees are paid differently based on their job responsibilities—which includes assignments and supervisory obligations—that difference constitutes a legitimate business purpose. *See Briggs*, 11 F.4th at 512-13. SJPS explains that the maintenance staff has distinct positions on different pay scales.[4] (Dongvillo Dep. 75-76.) These pay scales correlate to responsibilities and assignments. (*Id.*) Turner was hired for the lowest of those positions based on management's faith in his ability to complete the tasks reserved for the higher-scale positions.

---

[3] In *Woods*, the plaintiff filed claims under Title VII and the Equal Pay Act, but the court clarified that the prima facie analysis is identical. 640 F. App'x at 483; *see also Briggs*, 11 F.4th at 508.

[4] While Watts was hired for the groundskeeping position and eventually promoted to a supervisory role, the record indicates that the light-maintenance role for which Turner was hired was always a position with a lower salary. (*See* Turner Dep. 60-62; Dongvillo Dep. 75; King Dep. 33.)

11

(*Id.*; King Dep. 33, 51-52.)  Thus, paying Turner less due to his placement on the pay scale—which was based on King's assessment of Turner's proficiency, not race—is a legitimate, nondiscriminatory reason.

Because SJPS articulates a legitimate, nondiscriminatory reason for the pay discrepancy, the burden shifts back to Turner "to demonstrate that the reason is pretextual." *Briggs*, 11 F.4th at 513.  Turner does not offer any arguments or explanations demonstrating the pay-scale is a pretextual reason.  The record does not leave genuine questions of material fact.  SJPS has not changed its rationale for Turner's placement on the pay-scale.  King recounts contemporaneous dissatisfaction with Turner's performance that justified this decision.  (King Dep. 51-52.)  Turner has not met the burden to show pretext.  The wage discrimination claim fails as a matter of law.

### 3. Hostile Workplace (Count V)

To succeed on a hostile work environment claim, the workplace must be "permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839 (6th Cir. 2024) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).  Turner must show that

> (1) he belongs to a protected group; (2) he was subject[ed] to unwelcome harassment; (3) that harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment; and (5) the employer knew or should have known about the harassment and failed to take appropriate remedial action.

*Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021).  Turner has established he belongs to a protected group, but the rest of his prima facie case is less clear cut.

Turner claims that the work environment was hostile due to his strained relationships with King and Roll.  He points to specific confrontations with King and Roll over the hierarchy and

structure of the SJPS maintenance department, suggesting these interactions constitute a hostile environment. (Turner Dep. 153, 156-57.)

As indicated above, for harassment to rise to the level of a hostile work environment, it must be "sufficiently severe or pervasive to alter the conditions of his employment." *Strickland*, 995 F.3d at 507. "The work environment must be both objectively and subjectively hostile." *Id.* at 505. The Court considers "the frequency of the discriminating conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's performance." *Id.* at 506. Two instances of alleged harassment spanning Turner's years-long tenure at SJPS is not frequent, weighing against a hostile work environment. *See id.* (citing *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310-11 (6th Cir. 2016) (explaining that five instances of harassment over a 10-year span "is not frequent," while four incidents over six months is considered frequent)). Similarly, neither confrontation was a physical invasion against Turner. The harassment was not sufficiently severe or pervasive enough for a hostile work environment claim.

Further, for this Title VII hostile work environment claim, the alleged harassment must be based on Turner's race. But he attributes the mistreatment to work-related personality conflicts. He recognized that giving out instructions for tasks sparked his confrontation with Roll. (Turner Dep. 92-94.) His issues with King were similar. They were related to personality and workplace issues.

Turner suggests King made the work environment unbearable, ultimately leading to his resignation. However, he does not credit his resignation to racism. He claims his personal relationship with King became too strained, but it had "nothing to do with race." (*Id.* at 137.) The two merely did not like each other due to the perceived power struggle. (*Id.*) Turner may not have

13

liked how King and Roll acted, but even when looking at the facts in the light most favorable to Turner, "[m]ere disrespect or antipathy will not be actionable under [Title VII] unless a plaintiff can prove that such was motivated by discriminatory animus." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Turner admits that the disrespect he felt—the disrespect that made the work environment unbearable—was not motivated by race.  (Turner Dep. 137.)

While the complaint is vague, Turner also implies that his general isolation constitutes a hostile work environment.  "[E]vidence of racially-based isolation can constitute harassment that supports a hostile workplace claim." *Strickland*, 995 F.3d at 505 (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999)).  However, such isolation would need to be intentional and motivated by racial discrimination.  *See id.* at 507 (clarifying that this theory of a hostile work environment requires "concerted and pervasive efforts to segregate" the plaintiff).

Turner alleges his isolation was fueled by political differences.  But even in these instances, Turner was not isolated, let alone isolated through racially motivated, deliberate instruction from SJPS.  Turner recounts overhearing colleagues discuss President Donald Trump's policies in a break room, then abruptly changing the topic when he would approach.  (Turner Dep. 83-85.)  This is not the kind of isolating behavior hostile work environment claims encompass.  *See Moore*, 995 F.3d at 507 (explaining how a supervisor rearranging schedules and moving equipment around to force the plaintiff into constant isolation constituted a hostile work environment).  Turner does not demonstrate the requisite isolation, motivation, or intent.  His hostile work environment claim under Title VII fails as a matter of law.

### B. State Claims Under the ELCRA

Turner's remaining claims arise under state law.  The Court has supplemental jurisdiction over these claims.  Because the Court will dismiss Turner's federal claims, the Court must decide

whether to exercise supplemental jurisdiction over his claims arising under state law. Ordinarily, where the federal claims are dismissed prior to trial, the Court will dismiss the remaining state law claims. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))).

In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotation marks omitted)). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the interests of judicial economy and avoiding multiplicity of litigation do not outweigh needlessly deciding state law issues. Should Turner decide to pursue his state law claims, he has federal court filings as a starting point. Michigan courts are well-equipped to handle these state law claims should they arise. Accordingly, the Court will dismiss Turner's remaining claims without prejudice.

## IV. SANCTIONS

Zealous advocacy is expected of attorneys. The Court recognizes that an attorney enters the arena to put forth the best possible case for their client. Such conduct is celebrated as the fabric of our judicial system and due process. However, the contours of zealous advocacy stop at the

truth. When an attorney makes patent misrepresentations or falsehoods to the Court, they have betrayed their duty as an officer of the court. Carla Aikens, Plaintiff's attorney, submitted the complaint on Turner's behalf. Aikens's advocacy is, at best, riddled with misrepresentations.

When attorneys make representations to the Court in their pleadings, they certify that, to the "best of [their] knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*," the "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support." Fed. R. Civ. P. 11 (emphasis added). "Under Rule 11, sanctions may be imposed if a reasonable inquiry would have disclosed that the pleading, motion or other paper was not well-grounded in fact." *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 959 (6th Cir. 1990). An attorney is expected to discuss factual allegations with their client, particularly if such allegations describe the client's actions.

Aikens filed a complaint that advances certain legal theories and alleges Turner took certain actions during his employment with SJPS. Turner, in his deposition, contradicts many of the factual allegations used to support those theories.

The complaint alleges that SJPS "would take white employees to golf tournaments and would pay white employees so they did not have to take sick leave or vacation time." (Compl. 2.) The use of plural "tournaments" implies this was a pattern of behavior. First, Turner was only aware of one such potential outing. (Turner Dep. 122.) Second, he was invited to it, which counters the implication that SJPS used golf as a racial segregation tool. (*Id.*) Further, by all accounts, the maintenance department never went on any golf outings, canceling the only attempt when Turner declined the invitation. (King Dep. 48-49; Watts Dep. 48-49; Dongvillo Dep. 76-77.)

The complaint alleges that Turner "was required to work on projects that required more than one person." (Compl. 2.) Specifically, the complaint references when King "told Plaintiff to

16

lift a floor cleaner which weighed more than 200 pounds." (*Id.* at 3.) The complaint alleges that "[w]hen Plaintiff asked King for help, King refused." (*Id.*) However, Turner admits that he did not ask for help. (Turner Dep. 130.) He also discusses how King did not intentionally withhold resources that would assist Turner. (*Id.* at 134-36.) The implication that King knew Turner needed help, but refused it, is not supported by Turner's account of the incident.

The complaint alleges that "King would go out of his way to put down and humiliate Plaintiff after he was injured and reported issues, to the point that the environment became hostile. Two weeks later after the injury, Plaintiff was forced to leave his position because of the mistreatment by Defendant." (Compl. 3.) This allegation implies that King humiliated Turner until the work environment became hostile, which led to his resignation. Turner's deposition offers a conflicting account. According to Turner, King's humiliating conduct occurred *after* Turner resigned. (Turner Dep. 132, 138.) The humiliation occurred after King discussed a post-resignation encounter with Turner at a gas station. (*Id.*) Turner suggests King mischaracterized the interaction to his former colleagues. (*Id.*) The Court's concern is not with Turner's characterization of the conduct—he is entitled to his version of the story; the concern lies with his attorney's timeline of events. The complaint suggests this event created a hostile environment for Turner at work during his employment, but Turner resigned before King's alleged humiliating conduct. It is Turner's own account that establishes this chronology.

The complaint alleges that Turner made "continual attempts to have the situation remedied." (Compl. 8.) This allegation refers to the alleged harassment Turner experienced at SJPS. However, Turner testified that he did not raise these concerns, instead opting to "[k]eep[] [his] mouth quiet and just do[] [his] job." (Turner Dep. 161.)

A reasonable pre-filing inquiry—discussing the matter with her client—would have uncovered the inaccuracy of these allegations. But even if that was not the case, "Rule 11 is not a one-time obligation." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (quoting *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 374 (6th Cir. 1996)). Attorneys have "a continuing responsibility to review and reevaluate [their] pleadings and where appropriate modify them to conform to Rule 11." *Id.* (quoting *Runfola*, 88 F.3d at 374). If, at any point (i.e. after Turner's deposition), Aikens became aware that allegations in the complaint were inaccurate, she had an obligation to correct the record. She did not do so.

The Court does not seek to punish those who merely proffer insufficient evidence to survive a summary judgment motion. Similarly, the Court does not question the general good faith of Turner's claims. The Court, instead, questions Aikens's good faith in crafting the complaint and/or failing to correct it, as well as her inquiries to support the allegations.

The Court will order Aikens to show cause as to why sanctions under Rule 11 are not appropriate. Aikens should discuss her reasonable inquiries, both pre- and post-filing, and provide an explanation as to why she filed a complaint that is inconsistent with Turner's sworn testimony. She will have 14 days to respond to the show cause order.

## V. CONCLUSION

Turner's Title VII claims fail as a matter of law. The Court will not exercise supplemental jurisdiction over Turner's state claims. Accordingly, the Court will grant SJPS's motion for summary judgment. In addition to dismissing this case, the Court will order Aikens to show cause as to why sanctions are not warranted.

The Court will enter an order and judgment consistent with this Opinion.

Dated: November 21, 2024             /s/ Hala Y. Jarbou
                                      HALA Y. JARBOU
                                      CHIEF UNITED STATES DISTRICT JUDGE